UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                         CASE No. 1:18-cr-99

v.

                                         HON. ROBERT J. JONKER

MARK ANDREW McMICHAEL,

       Defendant.

_____/

## OPINION & ORDER

## INTRODUCTION

Federal law prohibits certain categories of individuals from possessing firearms and ammunition. These categories include, among others, felons, fugitives, illegal drug users and addicts, illegal aliens, and those convicted of a misdemeanor crime of domestic violence. Also included in this list are those who have "been adjudicated as a mental defective or . . . been committed to a mental institution." 18 U.S.C. § 922(g)(4). Defendant Mark Andrew McMichael is a gun collector. He has numerous firearms in his collection and, as recently as February 2016, Mr. McMichael has regularly renewed his Federal Firearms License from the Bureau of Alcohol, Tobacco, Firearms and Explosives. According to the government, he is also an individual who has been committed to a mental institution, and so he has violated federal law.

The government centers its argument on Mr. McMichael's approximately twelve-day hospitalization during May 2014 at the Munson Medical Center in Traverse City. During this time two doctors completed certificates that stated Mr. McMichael required mental health treatment. But no court, committee, board, or other authoritative body ever determined Mr. McMichael

needed to be committed to a mental institution. Rather, after the physicians completed their certifications, Mr. McMichael elected to defer a hearing and to cooperate with treatment. He completed the treatment and was discharged from the hospital without any court order putting him there.

Believing the hospitalization was enough to satisfy the predicate of being "committed to a mental institution" the government has charged Mr. McMichael in the Indictment with being a committed person in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(4). The government has also charged Mr. McMichael with making a false statement in a firearms license application, in violation of 18 U.S.C. § 924(a)(1)(A), for failing to affirmatively state on his subsequent renewal application that he had been committed to a mental institution. Mr. McMichael moves to dismiss both charges because, as a matter of law, he had never been committed to a mental institution or, in the alternative, he received insufficient process to deny him his Second Amendment rights. In the Court's view, Mr. McMichael's hospitalization does not amount to a commitment under the statute, and he did not make false statements when renewing his firearms license, as a matter of law. Therefore, the motion to dismiss must be **GRANTED.**

## LEGAL STANDARD

Mr. McMichael brings the instant motion under FED. R. CRIM. P. 12(b)(3)(B)(v) as a motion to dismiss the indictment for failure to state an offense. On a motion to dismiss an indictment, the Court must view the indictment's factual allegations as true and must determine only whether the indictment is "valid on its face." *Costello v. United States,* 350 U.S. 359, 363 (1956). "Generally, motions are capable of determination before trial if they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). "[W]here the

defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged in an indictment, the Court is reviewing a question of law, not fact." *United States v. Vertz*, 40 F. App'x 69, 70 (6th Cir. 2002) (citing *United States v. Bowman*, 173 F.3d 595 (6th Cir. 1999)). A reviewing court is permitted to "make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992).

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 10, 2014, Mr. McMichael's wife, Nicole, completed a Grand Traverse County Probate Court form entitled "Petition/Application for Hospitalization." (ECF No. 18-1, PageID.47). Nicole described several changes that she had observed in her husband's behavior, and she wrote that her husband needed treatment. The same day, Mr. McMichael was admitted to the Munson Medical Center, though he asserts his admission was voluntary and that he did not know his wife had completed the petition. It is clear that no court ordered the admission.

Between May 10 and May 12, Mr. McMichael was treated at the medical center. Then, on May 12, 2014, Dr. Douglas Gentry, M.D., completed a Grand Traverse County Probate Court form entitled "Clinical Certificate." On the form, Dr. Gentry diagnosed Mr. McMichael with "acute paranoia / schizophrenia" (ECF No. 18-1, PageID.49) and he reported that Mr. McMichael was a person requiring treatment. Dr. Gentry recommended that Mr. McMichael be hospitalized. (*Id.* at PageID.50). Thereafter, Mr. McMichael was transferred to the medical center's behavioral

---

[1] Here, the Court briefly sets out a basic outline of preliminary findings of fact necessary to resolve the motion. The facts recited here are essentially undisputed. The pleadings, moving papers, and oral argument paint a much more colorful picture of events—including marital strife, intrigue, and child custody disputes. The Court discusses some of these additional asserted facts below because they illustrate potential constitutional problems if "commitment" is construed too broadly. They are not essential to the legal analysis.

3

health services program. On May 13, 2014, Mr. McMichael was examined by a psychiatrist, Dr. Thomas Harding, M.D. After the examination, Dr. Harding completed a second certificate that was identical to the one completed by Dr. Gentry. (*Id.* at PageID.51). Dr. Harding diagnosed Mr. McMichael with psychosis, and further concluded that Mr. McMichael required treatment. He too recommended hospitalization. (*Id.* at PageID.51-52). These certificates were filed with the probate court, and Mr. McMichael was appointed counsel. The next step was a court hearing.

However, on May 15, 2014 and before any hearing took place, Mr. McMichael signed a completed probate court form entitled "Request to Defer Hearing on Commitment." (*Id.* at PageID.56). On the form, Mr. McMichael checked a box indicating that he agreed to a combined hospitalization and alternative treatment program for up to 90 days, with hospitalization not to exceed 60 days. Mr. McMichael further requested that his court hearing be deferred, and he affirmed that he understood he could refuse subsequent treatment and demand a court hearing. (*Id.*). Mr. McMichael was then treated by Munson's behavioral health services and discharged on May 21, 2014.

Throughout the following years, Mr. McMichael maintained his firearm collection and regularly renewed his firearms license. The applications he completed contained the following statement: "Under penalties imposed by 18 U.S.C. § 924, I certify that the statements contained in this renewal application, and any attached statements, are true and correct to the best of my knowledge and belief." One of the questions in the renewal application asked Mr. McMichael "have you ever been committed to any mental institution?" The government states Mr. McMichael

4

answered in the negative, and at least for purposes of this motion, Mr. McMichael does not aver

otherwise.[2]

---

[2] The precise form or forms submitted by Mr. McMichael are not in the record.  The most current version of the form (available at *Instructions for Form 7/7CR – Application for Federal Firearms License*, ATF, https://www.atf.gov/firearms/instructions-form-77cr-application-federal-firearms-license (last visited Oct. 3, 2018)) includes an extended discussion of the term "committed" for purposes of the form.  The entire instruction reads, "Have you ever been adjudicated as a mental defective OR have you ever been committed to a mental institution?"  The instruction refers the application to the following definition of "committed to a mental institution":

> **Committed to a Mental Institution -** A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution

*Id.*  The definition also excepts those that have been granted relief by a State under a qualifying mental health relief from disabilities program, *id.*, as well as certain other qualifying events:

> **EXCEPTION:** Under the NICS Improvement Amendments Act of 2007, a person who has been adjudicated as a mental defective or committed to a mental institution in a State proceeding is not prohibited by the adjudication or commitment if the person has been granted relief by the adjudicating/committing State pursuant to a qualifying mental health relief from disabilities program. Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of the Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication/commitment; (d) the adjudication or commitment, respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code; or (e) the person was granted relief from the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities

On December 1, 2017, acting on a tip, ATF agents executed a search warrant at Mr. McMichael's residence and recovered the firearms and ammunition listed in the indictment. On May 8, 2018, the grand jury returned the Indictment in this case. (ECF No. 1). Mr. McMichael filed his motion to dismiss on August 1, 2018 (ECF No. 18) and the Court heard oral argument on September 13, 2018.

## DISCUSSION

Under § 922(g), "the government must prove three elements: (1) the defendant falls within one of the categories listed in the § 922(g) subdivisions ('the status element'); (2) the defendant possessed a firearm or ammunition ('the possession element'); and (3) the possession was 'in or affecting [interstate or foreign] commerce.'" *United States v. Rehaif*, 888 F.3d 1138, 1143 (11th Cir. 2018).

Mr. McMichael is charged under 18 U.S.C. § 922(g)(4). The status element in that section is that of a person "who has been adjudicated as a mental defective or who has been committed to a mental institution[.]" Read in total, Section 922(g)(4) states:

> It shall be unlawful for any person-(4) who has been adjudicated as a mental defective or has been committed to any mental institution, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

_____

program. Persons who fall within one of the above exceptions should mark "no" in the applicable box. This exception to an adjudication or commitment by a Federal department or agency does **not** apply to any person who was adjudicated to be not guilty by reason of insanity, or based on a lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

The possession and interstate commerce elements of the statute are not at issue in this motion. And the government does not contend that Mr. McMichael has been adjudicated as a mental defective. But the government does argue that Mr. McMichael was committed to a mental institution and, therefore, is prohibited from possessing firearms and ammunition.

Section 922(g)(4) does not define "committed" and both sides offer competing constructions. The government, relying on *United States v. Vertz*, 40 F. App'x 69 (6th Cir. 2002), an unpublished split decision by the Sixth Circuit Court of Appeals, argues it is enough that two physicians provided certifications affirming the necessity of the commitment. On the other hand, Mr. McMichael contends that a temporary and ex parte hospitalization is not enough for a commitment under the statute, and some formal action by an authoritative body is required to satisfy the statute (as well as due process). Accordingly, the dispositive question presented by both sides is whether Mr. McMichael's May 2014 hospitalization—one that all agree was not triggered by an adversary proceeding or adjudicative decision—amounts to a commitment to a mental institution under Section 922(g)(4). The Court concludes it does not.

### 1. Interpreting the Statute

The Court begins by looking at the statute itself. "The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *United States v. Jackson,* 635 F.3d 205, 209 (6th Cir. 2011) (quoting *United States v. Choice,* 201 F.3d 837, 840 (6th Cir. 2000)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 351 (1997). "A fundamental canon of statutory construction is that, unless otherwise defined, words

will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580-81 (1975)).

### A. The Language Itself

The Court finds that to be "committed" for purposes of this statute means more than that an individual spent time in a mental institution. This conclusion is based, first of all, on the word itself. To "commit" means "to place officially in confinement or custody" *American Heritage College Dictionary* 280 (3d ed. 1997); or "[t]o send (a person) to prison or to a mental-health facility, esp. by court order" *Black's Law Dictionary* 329 (10th ed. 2004); or "to place in or send officially to confinement . . . to consign legally to a mental institution." *Webster's Third New Int'l Dictionary* 457 (1976). Notably, at least for the sources available to the Court, all the definitions contemplate to some degree an official or authoritative act. And this interpretation is further bolstered by the specific context in which the language was used. Section 922(g)(4) contains two separate status elements: (1) adjudicated as a mental defective; or (2) committed to a mental institution. Clearly, the former element requires some sort of authoritative decision. And in putting the two together in the same section, it makes sense that Congress contemplated that both status elements required an official act, which is consistent with the definitions laid out above.

### B. The Context of the State Process

A look at context logically invites an examination of the state commitment process in Michigan—the state where Mr. McMichael was hospitalized. The government objects that the question here is one of federal law and urges the Court not to rely on the state terminology. (ECF No. 24, PageID.122). The government also points the Court to language from the Sixth Circuit suggesting that to do otherwise would be to "sacrifice any hope of uniform application of the federal statute." *Vertz*, 40 F. App'x at 74-75. Of course, whether a person has been committed to

8

a mental institution for purposes of the statute is a question of federal law. *See United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir. 1988). The Court agrees that the labels a state chooses to use in its statutes are not controlling. But the State process is still a natural, appropriate, and correct place to understand the adjudicative or committal process. Federal courts already look to state law to determine whether certain predicate convictions count as disqualifying felonies under Section 922(g)(1). *See United States v. Zellars*, 334 F. App'x 742, 744 (6th Cir. 2009) ("What constitutes a 'crime punishable by imprisonment for a term exceeding one year' is defined in accordance with the law of the jurisdiction in which the proceedings were held") (citing 18 U.S.C. § 921(a)(20)). The same principle applies here.

This is also consistent with the decisions of several circuit courts that have been tasked with interpreting Section 922(g)(4) and have uniformly concluded that it is permissible to look to state commitment procedures for guidance. *See Giardina*, 861 F.2d at 1335; *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995) (noting that the court should seek guidance from state law "because it will almost always be the case that a prior commitment will have occurred pursuant to state law"); *United States v. Waters*, 23 F.3d 29, 31 (2d Cir. 1994) (citing *Giardina*); *United States v. Chamberlain*, 159 F.3d 656, 658 (1st Cir. 1998), abrogated on other grounds by *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012). Even *Vertz*, while disagreeing with the weight other courts had given to state labels, recognized that "federal courts often look to state law to help determine whether a commitment has occurred." *Vertz*, 40 F. App'x at 73. Accordingly, the Court turns to the framework of the commitment process in Michigan.

Mr. McMichael was hospitalized under Chapter Four of Michigan's mental health code, and specifically under the procedures for admission by medical certification, set out at MICH.

COMP. LAWS § 330.1422 *et seq*.[3]  This section sets out two overarching steps for hospitalizing an individual for mental health treatment.  The first step is a temporary hospitalization after a hospital receives 1) a petition completed by an adult asserting that the individual at issue is a person requiring treatment;[4] 2) a physician or licensed psychologist's clinical certificate asserting the same, and; 3) an authorization by a community mental health program's screening unit.  MICH.

---

[3] Chapter Four of the code contains three other procedures: informal voluntary admission, formal voluntary admission, and admission by petition.

[4] MICH. COMP. LAWS § 330.1401 defines "person requiring treatment" as any one of the following:

   (a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

   (b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

   (c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

   (d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

Comp. Laws § 330.1423.   Thereafter, "as soon after hospitalization as is practicable" which usually must be no more than 24 hours after hospitalization, an individual hospitalized under Section 1423 must be examined by a separate psychiatrist.[5]  If the psychiatrist does not certify that the individual requires treatment, then the individual must be released.  However, if the psychiatrist does certify that the individual requires treatment, then the individual's "hospitalization may continue pending hearings convened" under later sections of the mental health code.  Mich. Comp. Laws § 330.1430.  The hospital is required to provide a notice of hospitalization, along with the petition and two clinical certificates to the probate court.    Mich. Comp. Laws § 330.1431(1).

The second step of admission by the medical certification process is a court hearing.  This process is set out in Sections 1451 through 1468 of the mental health code.  Section 1452 begins by requiring that after a court receives the petition and two certificates, a hearing must "be convened promptly," that is, no more than seven days after the court receives the documents.  The court is further required to appoint counsel if the individual is not represented.  Mich. Comp. Laws § 330.1454.  Section 1458, in turn, provides that an individual may demand that a jury decide whether the individual requires treatment, or is legally incompetent.  And Section 1461 requires, in most cases, that a physician or licensed psychologist who has personally examined the individual must testify in person or by written deposition at the hearing.  Furthermore, Section 1465 states that the court or jury may not find that an individual is a person requiring treatment unless it has been established by clear and convincing evidence.  Section 1468 then provides that at the conclusion of the hearing, if an individual is found not to be a person requiring treatment,

---

[5] This section of the code also contains procedures for placing an individual into custody and transporting the individual to a preadmission screening unit.  *See* Mich. Comp. Laws §§ 330.1426-1427.  These mechanisms are not relevant here, since Mr. McMichael was already admitted to the Medical Center when the certifications were completed.

the court is required to order that the individual be discharged.  However, if the individual is found

to be a person requiring treatment, the court is required to order that the individual be hospitalized,

order that the individual undergo an alternative program, order a combination of hospitalization

and alternative treatment, or order assisted outpatient treatment.  MICH. COMP. LAWS § 330.1468.

An individual temporarily hospitalized under a medical certification, however, may not

always proceed to a court hearing.  This is because Section 1455 of the mental health code states

that an individual may defer a hearing and elect to be treated on a voluntary basis.  Specifically,

under Section 1455(6) an individual who otherwise would be set to appear for a hearing to

determine whether he or she is a person requiring treatment "may file with the court a request to

temporarily defer the hearing[.]"  MICH. COMP. LAWS § 330.1455(6). The section further provides

that "[t]he request shall include a stipulation that the individual agrees to remain hospitalized and

to accept treatment as may be prescribed" and that "[t]he request to temporarily defer the hearing

shall be on a form provided by the department [of mental health] and signed by the individual in

the presence of his or her legal counsel and shall be filed with the court by legal counsel."  *Id.*[6]

Once the deferral request and stipulation have been received by the court, the court is required to

defer the hearing.  During this time, the petition and clinical certificates remain valid, and the court

retains jurisdiction.  Furthermore, after the deferral request and stipulation have been received by

the hospital, the hospital is required to "treat the individual as a formal voluntary patient without

requiring the individual to sign formal voluntary admission forms."  If an individual subsequently

---

[6] Though this section speaks of an individual hospitalized under a petition as set out in Section 1434, rather than under medical certification, it clearly applies to those temporarily hospitalized under Section 1423 as well.  *See* MICH. COMP. LAWS § 330.1430 (noting that those temporarily hospitalized under Section 1423 may be hospitalized pending hearings convened under Sections 1451 through 1465 of the code).

refuses treatment or requests a hearing, the court is required to be notified, which will then convene a hearing.  MICH. COMP. LAWS § 330.1455(7)-(8).

### C.  The Construction of "Committed" in Section 922(g)(4)

After a look at the language itself as well as the context in which that language is used, which includes a look at the state process, the Court holds that the plain meaning of "committed" for purposes of Section 922(g)(4) is not broad enough to cover what happened to Mr. McMichael. Rather the term requires that a third party direct that the individual be treated by a mental institution, and that the third party be some official or authoritative body making the decision on an evidentiary record.  In other words, under the statute, a commitment does not occur until the completion of an adversary process that results in an adjudicative decision in favor of hospitalization.[7]

The text of Section 922(g)(4) drives this result, but the interpretation is consistent with the definition of "committed" as found in the text of the Federal Firearm Regulations.  Under the applicable regulation, "committed to a mental institution" means:

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 178.11. The regulation makes clear, therefore, that a voluntary hospitalization or a hospitalization for observation does not amount being "committed to a mental institution" and, furthermore, that an affirmative commitment decision by some authoritative body is also required.

---

[7] Because the Court determines the statute is not ambiguous, it does not address Mr. McMichael's alternative argument that invokes the rule of lenity.

The result the Court reaches is also consistent with how the Department of Justice, in a 2014 Notice of Proposed Rulemaking, understood the term:

> Persons are not considered to have been "committed to a mental institution" as a result of a voluntary admission to a mental institution or a temporary admission for observation unless the temporary admission for observation turns into a qualifying commitment as a result of a formal commitment by a court, board, commission, or other lawful authority.

Amended Definition of "Adjudicated as a Mental Defective" and "Committed to a Mental Institution" (2010R-21P), 79 Fed. Reg. 774-01, 2014 WL 31980 (proposed Jan. 7, 2014).

Neither of these texts is controlling, but both of them fully support the Court's statutory construction.[8]

### 2. *Vertz* and the Changed Landscape

In reaching the above construction, the Court declines the government's invitation to extend the Sixth Circuit's unpublished decision in *Vertz*. Because *Vertz* is an unpublished decision, it is not binding precedent, although it may be considered for its persuasive value. *Music v. Arrowood Indemnity Co.*, 632 F.3d 284, 288 (6th Cir. 2011); *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). Here, it is worthwhile to discuss the decision, factual differences between *Vertz* and this case, and why the legal landscape has changed since that decision such that the *Vertz* decision is no longer persuasive authority.

---

[8] The result is also consistent with the definitions and instructions included in the most recent ATF form. The entire instruction is quoted in footnote 2, *supra*. Of particular note is the form's definition which states that "a person . . . is not prohibited by the adjudication or commitment if . . . (d) the adjudication or commitment, respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority."

14

A.  *The* Vertz *Case*

*Vertz* originated in this district before the Honorable Robert Holmes Bell.   Like Mr. McMichael, Mr. Vertz was charged with violating Section 922(g)(4) after he was previously hospitalized under Michigan's medical certification procedures.   *United States v. Vertz*, 102 F. Supp. 2d 787, 789 (W.D. Mich. 2000).   While the underlying commitment history in that case is not extensively detailed, it is clear enough that Mr. Vertz did not defer his court hearing.  Instead, he received a hearing five days after being hospitalized.   At the hearing, the probate court concluded that Mr. Vertz was a person requiring treatment.   "This probate court order did not, however, result in a hospital commitment. The court found that there was 'an available treatment program other than hospitalization appropriate to meet the individual's treatment needs.'"  *Id.* Judge Bell did not examine whether the probate court's decision constituted being "committed to a mental institution."[9]   Instead, Judge Bell concluded that because Mr. Vertz's initial hospitalization prior to the hearing had been supported by the required second psychiatrist certification, the hospitalization qualified as a commitment to a mental institution under Section 922(g)(4).  *Id.* at 791.

A divided panel affirmed Judge Bell's decision on appeal.  *Vertz*, 40 F. App'x at 77.  Judge Clay dissented.   He wrote that "temporary or emergency detentions for treatment of mental disorders or difficulties which do not lead to formal commitment under state law, do not constitute the kind of commitment envisioned by 18 U.S.C. § 922."  *Vertz*, 40 F. App'x at 77 (Clay, J., dissenting). Judge Clay further stated that the "Michigan statutory scheme require[s] that a

---

[9] There is at least some suggestion that certain types of treatment aside from hospitalization may nevertheless qualify under the statute.  *See United States v. B.H.*, 466 F. Supp. 2d 1139, 1147-48 (N.D. Iowa 2006) (concluding "that outpatient treatment may constitute commitment to a mental institution. . . . The statute only requires commitment *to* a mental institution, not commitment *in* a mental institution.") (citations omitted) (emphasis in original).

'commitment' [does] not occur until the probate court orders a person into hospitalization or alternative treatment[.]"  *Id.*

### B.  Vertz *is Factually Distinguishable From This Case*

In finding that *Vertz* is not persuasive the Court concludes, first of all, that *Vertz* is not entirely on all four corners with the instant case.  True, both the district court and the Sixth Circuit found that the requirements of a commitment under Section 922(g)(4) were met once the second certification had been completed, and distinguished two other circuit decisions on this basis.  But a review of the Sixth Circuit's entire decision demonstrates that it was also important that Mr. Vertz had been declared mentally ill by a court—something that never happened for Mr. McMichael.  In distinguishing the other cases, the Sixth Circuit relied on the probate court's determination that Mr. Vertz was mentally ill.  *Vertz*, 40 F. App'x at 74.  Later in the decision, the court again referenced the fact that the probate court had declared Mr. Vertz to be in need of treatment and had ordered continued, alternative, treatment.[10]  *Id.* at 75-76.  Thus the court in *Vertz* was not squarely presented with a hospitalization unsupported by any type of adjudication, as is the case here.

### C.  *Decisions After* Vertz

More significantly, *Vertz* is not persuasive because of the changed legal landscape since that decision.  This is most evident in the First Circuit's recent abrogation, in *Rehlander*, of its earlier decision in *United States v. Chamberlain*, 159 F.3d 656, 660 (1st Cir. 1998), a case that both the district court and the Sixth Circuit heavily relied on in their *Vertz* decisions.  In

---

[10] In a footnote, the court noted it was not deciding whether the alternative treatment ordered by the probate court was a commitment, but emphasized that the probate court's finding that Mr. Vertz was mentally ill lent further support to the conclusion that his pre-hearing hospitalization was a valid commitment.  *Vertz*, 40 F. App'x at 76 n.5.

*Chamberlain*, the First Circuit held that a five-day emergency hospitalization under Maine's involuntary hospitalization procedures, without any judicial involvement, amounted to a commitment to a mental institution.  Its holding was based in large part on its conclusion that a broad interpretation was consistent with a claimed federal policy to keep firearms out of the hands of those who pose a risk or potential for harm.  *Chamberlain*, 159 F.3d at 662.

In 2012, however, the First Circuit abrogated the decision after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *See United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).  In *Rehlander*, the First Circuit stated that its decision in *Chamberlain* had been a permissible reading of the statute at that time, but it concluded that after *Heller* principles of constitutional avoidance compelled the court to construe the statute in a narrower fashion, and to conclude that temporary, ex parte hospitalizations are not encompassed by the statute.  *Id.* at 47.  A contrary holding, the court further reasoned, would raise due process concerns after *Heller.  Id.* at 47-49.

*Rehlander* remains the most recent decision to have thoroughly engaged the issue. However, after *Rehlander* the 11th Circuit favorably cited decisions in the First, Fourth, Fifth, and Eighth circuits that recognized commitment to a mental institution requires an adjudicative component.  *See United States v. McIlwain*, 772 F.3d 668, 696 (11th Cir. 2014) (citing *Giardina*, *Hansel*, *Rehlander, United States v. Midgett,* 198 F.3d 143 (4th Cir. 1999), and *United States v. Dorsch*, 363 F.3d 784, 785 (8th Cir. 2004), and noting that "[a]ll of these circuit court decisions place primary importance on whether some authoritative body—a court, a county board—rendered a decision about the defendant's mental illness and ordered commitment.").  The trend of the courts, then, is to require some type of adversary hearing resulting in an adjudication before a

commitment to a mental institution under Section 922(g)(4) will be found.  The result reached by the Court today is consistent with that trend.[11]

### D.  Avoiding Due Process Concerns

The *Rehlander* decision demonstrates how the legal landscape has changed since *Vertz* because of the Supreme Court's decision in *Heller*.  The decision made it clear that the Second Amendment right to bear arms is a personal right that is untethered to any militia.  *Heller*, 554 U.S. at 595 (holding that the Second Amendment confers "an individual right to keep and bear arms.")  This means that the government cannot arbitrarily deprive a citizen of that right.  This consideration was not before the courts in *Vertz* and *Chamberlain*.  As demonstrated by *Rehlander*, the due process concerns support the Court's construction of the statutory prohibition to require some kind of authoritative adjudication by a third party authority on an evidentiary record.

To be sure, the Supreme Court explicitly stated that nothing within the decision should "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]"  *Heller*, 554 U.S. at 626.  But this still leaves the question of what procedural protections are required by due process to deprive a person based on a declaration of mental illness requiring commitment of the constitutional right recognized in *Heller*.  The Sixth Circuit Court of Appeals has found there are due process holes in the existing statutory process, at least as long as the safety valve restoration process as found in 18 U.S.C. § 925(c) remains unavailable.  *See Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 694 (6th Cir. 2016) (noting that the relief-from-disabilities program in Section 925(c) has historically been unfunded in Congressional

---

[11] The court in *McIlwain* ultimately found the defendant's motion to dismiss the indictment meritless because there was a formal commitment order issued by a court in that case.  *McIlwain*, 772 F.3d at 697.  The legal analysis required the formal court order, however, and is therefore consistent with the Court's construction.

appropriations bills, and that Michigan has not created a qualifying relief program effectively leading to a permanent ban under Section 922(g)(4)).

*Tyler* did not settle the question of exactly what process is due before deprivation of the *Heller* right to bear arms. But without an adversary adjudication of the need for mental health commitment, there are serious due process questions under a balance of the traditional *Mathews* and *Morrissey* due process factors. "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (alteration in original). "The ordinary mechanism that [courts] use for . . . determining the procedures that are necessary to ensure that a citizen is not 'deprived of life, liberty, or property, without due process of law,' U.S. Const., Amdt. 5, is the test . . . articulated in *Mathews*[.]" *Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004). Under *Mathews*, courts must balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See Mathews*, 424 U.S. at 335.

In weighing these considerations in the context of access to higher education, a recent decision from the Sixth Circuit is illustrative. In *Doe v. Baum*, the court held that in the context of school discipline, the opportunity to confront and cross examine an accuser—one key component of an adversary process—is required by the Constitution when the school must "choose between competing narratives to resolve a case." *Doe v. Baum*, ___ F.3d ___, No. 17-2213, 2018 WL 4265634, at *1 (6th Cir. Sept. 7, 2018). If such an adversary process is necessary to remove

an individual from a public school, it follows that there is at least a fair due process question whether the same type of proceeding is required before there is a permanent deprivation of an individuals' right to possess a firearm.   And as we have already seen, similar concerns led the Court in *Rehlander* to hold that a temporary ex parte hospitalization does not amount to a commitment under Section 922(g)(4).

Without some type of adversary process, the risk of an erroneous (and permanent) deprivation of Mr. McMichael's Second Amendment rights, and others like him, is particularly high.   Hospitalization for mental health reasons often arises in times of family turbulence or other emotionally charged settings.   The competing narratives in this case illustrate the risks.   According to Mr. McMichael, he voluntarily admitted himself to Munson Healthcare after experiencing several stressful events in his life.   He suggests that at the time his wife was cheating on him with Michigan State Police Lieutenant Scott Woodward, the individual she married after her divorce from Mr. McMichael.   It is not hard to imagine a spouse in a marital conflict with motive to embellish the extent of her husband's symptoms, which in turn could have tainted the examinations of Dr. Gentry and Dr. Harding.   Yet this was all there was to support hospitalization without an adversary hearing.   Then, after Mr. McMichael and his wife divorced, the court awarded Mr. McMichael custody of his children.   After Mr. McMichael's ex-wife married Lieutenant Woodward, the new couple asked that Mr. McMichael agree to changing the terms of the custody arrangement.   When Mr. McMichael refused, Lieutenant Woodward threatened to tip off ATF agents about Mr. McMichael's stay at Munson Medical Center.   Lieutenant Woodward ultimately went through with the threat, leading to the instant charges against Mr. McMichael.

The government does not accept this narrative, and a fact-finder may not either.   But the story is certainly plausible, and capable of repetition in other cases,  illustrating the risk of an

erroneous deprivation of Second Amendment rights in a process that does not incorporate adversary protections.  An adversary hearing would provide an opportunity for an individual to present such arguments to an authoritative body, and question the physicians who recommended the individual be hospitalized.  A statutory construction of "committed" that requires an adversary process avoids the constitutional questions that would arise if *Vertz* is extended beyond its facts to apply in a case like this, where no court ever made a finding mandating commitment.  As *Rehlander* persuasively demonstrates, an ex parte hearing is not enough to fall within the Section 922(g)(4) prohibition; some adversary process is necessary for a "commit[ment]" under Section 922(g)(4).

### E.   Waiver / Deferral

The government argues that even if an adversary process is required to trigger the Section 922(g)(4) prohibition, it was available to Mr. McMichael under the Michigan statute.  Rather than proceed with the hearing, Mr. McMichael elected to defer the hearing and proceed with treatment.  According to the government, Mr. McMichael cannot use the deferral process both as a sword and a shield, and this Court should find that Mr. McMichael voluntarily waived his right to an adversary hearing, eliminating any statutory or constitutional problem.

The Court disagrees.  The parties all agree that no adversary process actually happened at any time before or during Mr. McMichael's stay at the Munson Medical Center.  Under the state law process, Munson was required to treat Mr. McMichael as a formal voluntary patient.  MICH. COMP. LAWS § 330.1455(8).  The available record suggests that Mr. Michael made multiple comments expressing a desire to go home, but neither party suggests that Mr. McMichael ever refused to continue his treatment or demanded a court hearing.

21

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938); accord *United States v. Riddle,* 249 F.3d 529, 534 (6th Cir. 2001). Here, the government has not shown that Mr. McMichael intentionally relinquished or abandoned his right under the Michigan statutory framework to a hearing in front of the probate court. In fact the form Mr. McMichael signed that requested a deferral of his hearing confirms that Mr. McMichael retained the right to have a hearing. In other words, Mr. McMichael relinquished nothing. Choosing to defer an opportunity to have a hearing is not the same thing as waiving a right to have the hearing. Accordingly, the Court finds this argument to be unpersuasive.

### 3. The Section 924(a)(1)(A) Count

The government charges Defendant not only with possession of a firearm after commitment to a mental institution under Section 922(g)(4)—a charge that cannot be legally sustained on the admitted facts—but also with lying on his firearm collector license renewal form. Under Section 924(a)(1)(A), it is a crime to "knowingly make[] any false statement or representation" on such a form. Following his stay at Munson Medical Center in 2014, Mr. McMichael submitted collector renewal forms in which he answered "no" to the question of whether he had ever been committed to any mental institution.

The Court has just held that a temporary, ex parte hospitalization with no adjudication does not amount to having been "committed to a mental institution" under Section 922(g)(4). Since all agree Mr. McMichael was only temporarily hospitalized under ex parte procedures, he was never committed to a mental institution for purposes of Section 922(g)(4). And accordingly, he did not make any false statement—knowingly or otherwise—on the renewal forms.

The government insists this charge must stand independently of Section 924(g)(4) because Mr. McMichael's statement was false when he made it, at least under an extension of *Vertz.* A

22

contrary finding, it says, would permit license seekers to "guess" on what the law might be in the future and escape the consequences of an incomplete disclosure. The Court disagrees. The only hospitalization at issue is the 2014 stay at Munson, which does not qualify as a "commitment" because it was never the result of an adversary hearing. Mr. McMichael did not, therefore, make a false statement on the ATF form when he renewed his firearms license and reported honestly that he had never been committed. *See United States v. Spring*, 886 F. Supp. 2d 37, 39 (D. Me. 2012) (granting a defense motion for acquittal of a similar charge after the *Rehlander* decision). If the form had asked Mr. McMichael to list all hospitalizations, whether by commitment or otherwise, perhaps the outcome would be different. But that is not what the form asked.[12] Accordingly, Count 2 of the Indictment, the only other charge in this case, must also be dismissed.

## CONCLUSION

For all these reasons, the Indictment is dismissed in its entirety. The Court is making no judgment on policy grounds about whether Mr. McMichael should, or should not, be permitted to possess firearms and ammunition. The Court merely concludes as a matter of law that Mr. McMichael was not prohibited, under Section 922(g)(4), from possessing firearms or ammunition because he has never been committed to a mental institution.

**ACCORDINGLY, IT IS ORDERED** that Counts 1 and 2, as well as the forfeiture allegation contained in the May 8, 2018 Indictment against Defendant Mark Andrew McMichael are **DISMISSED.**

---

[12] Moreover, the current version of the form includes instructions that seem to bolster the conclusion that a hospitalization for "observation"; or on a voluntary basis; or without a "formal commitment" and based on medical findings alone, without an opportunity for third party hearing do <u>not</u> qualify as reportable commitments. At a minimum, this undercuts the required scienter of "knowingly" making a false statement.

**IT IS FURTHER ORDERED** that the United States Magistrate Judge's Order imposing conditions of release (ECF No. 5), including a prohibition on possessing firearms, remains in effect pending the government's decision whether to appeal under 18 U.S.C. § 3731. Either party may seek modification of the terms of release under 18 U.S.C. §§ 3142, 3143(c) upon the government's filing of a Notice of Appeal. If there is no timely Notice of Appeal, the order specifying the terms of release will expire at the conclusion of the time for appeal.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED.**

Dated:    October 5, 2018              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE